The Christian School Association of Greater Harrisburg, Petitioner *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Respondent.

The Christian School of Grace Baptist Church, Petitioner *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Respondent.

Northumberland Christian School, Petitioner *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Respondent.

Frankford Friends School, Petitioner *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Respondent.

Germantown Friends School, Petitioner *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Respondent.

Argued September 9, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, BLATT, CRAIG and MACPHAIL. Judge WILLIAMS, JR. did not participate.

*Marcus A. McKnight, III, Irwin, Irwin & Irwin,* for petitioners, The Christian School Association of Greater Harrisburg, The Christian School of Grace Baptist Church, and Northumberland Christian School.

*Henry S. Hilles, Jr.,* with him *Robert H. Young, Jr., Drinker, Biddle & Reath,* for petitioners, Frankford Friends School and Germantown Friends School.

*Mary Ellen Krober,* Deputy Attorney General, with her *Robert E. Chernicoff,* Assistant Attorney General, *Allen C. Warshaw,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Attorney General, for respondent.

OPINION BY JUDGE BLATT, December 23, 1980:

These consolidated appeals are brought by five private religious schools from separate decisions of the Pennsylvania Department of Labor and Industry (Department) which determined that each school was subject to the provisions of the Unemployment Compensation Law (Pennsylvania Law)[1] and that each school should therefore be assessed unemployment contributions pursuant to Section 304 of the Pennsylvania Law, 43 P.S. §784. The schools contend that they fall within the language of an exemption in the Pennsylvania Law for certain religious organizations.

The five schools in question are: the Frankford Friends School which has an enrollment of 140 children in the grades of kindergarten through sixth grade and which is operated on grounds owned by the Frankford Meeting of Friends; the Germantown Friends School which has an enrollment of 850 children in grades kindergarten through twelfth grade and which is operated on grounds owned by the Germantown Monthly Meeting of Friends; the Northumberland School which has an enrollment of 60 children in grades kindergarten through the twelfth grade and which is operated on grounds owned by the First Regular Baptist Church of Northumberland;

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §751 et seq.

the Christian School of Grace Baptist Church which has an enrollment of 117 children in grades kindergarten through sixth grade and which is operated on grounds owned by the Grace Baptist Church of Carlisle; and a school operated by the Christian School Association of Harrisburg which has an enrollment of 260 children in grades kindergarten through ninth grade and which is independent of and unaffiliated with any specific church.

A brief review of the relevant statutory history is helpful to an understanding of this controversy. Prior to 1977, the Pennsylvania Law and the Federal Unemployment Tax Act, 26 U.S.C. §3301 et seq., contained a blanket exemption for all primary and secondary schools, both public and private. In 1976, however, Congress amended the Federal Unemployment Tax Act and eliminated the exemption from the federal law. In 1977, Pennsylvania also eliminated[2] its blanket exemption for primary and secondary schools. Act of July 6, 1977, P.L. 41. Like the federal law, however, the Pennsylvania Law retained the following relevant exemption for certain organizations:

> Service performed in the employ of (i) a church or convention or association of churches or (ii) *an organization which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches....* (Emphasis added.)

[2] State unemployment compensation laws are usually mirror images of the federal legislation because, in order for employers in a state to take a credit against their federal tax liability accruing under the federal unemployment laws, the state unemployment laws must adhere to the same standards as the federal laws. *See* 26 U.S.C. §3304.

Section 4(1)(4)(8)(a) of the Pennsylvania Law, 43 P.S. §753(1)(4)(8)(a); *See* 26 U.S.C. §3309(b)(1).

In 1977 and 1978, the Pennsylvania Office of Employment Security notified the five schools who are the petitioners here that, because of the aforementioned statutory changes, they were covered by the Pennsylvania Law. The schools contested their tax assessments at reassessment hearings, arguing that they fell under the exemption for religious organizations, but the Department affirmed the assessments in March and April of 1979. These appeals followed.

The schools contend here, of course, that they fall within the exemption of Section (4)(1)(4)(8)(a)(ii) of the Pennsylvania Law, 43 P.S. §753(1)(4)(8)(a)(ii), for organizations "operated primarily for religious purposes and which [are] operated, supervised, controlled or principally supported by a church or convention or association of churches." In the alternative, they submit that the Department's interpretation of the Pennsylvania Law, so as to include them under its coverage, unconstitutionally infringes upon their right to the free exercise of religion as guaranteed by the first amendment of the United States Constitution and as applied to the states through the fourteenth amendment of the United States Constitution.[3]

Initially, we note that the statutory exemption for religious organizations in Section 4(1)(4)(8)(a)(ii) contains two requirements, both of which must be met: (1) that the organization be "operated primarily for religious purposes" and (2) that the organization be "operated, supervised, controlled or principally supported by a church or convention or association of churches."

---

[3] *See also*, Pennsylvania Constitution, Article 1, Section 3.

As to the first requirement, the words "operated primarily for religious purposes" create an imprecise standard which lends itself to different interpretations, and, as the Department points out, such an exemption would normally be given a strict construction with all doubts construed against the taxpayer. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa. C. S. §1928(b)(5); *Equitable Gas Co. v. Commonwealth of Pennsylvania,* 18 Pa. Commonwealth Ct. 418, 335 A.2d 892 (1975). As the petitioners point out, however, that rule of strict construction is superseded in instances where there is a strong possibility that the statute in question infringes upon a party's right to the free exercise of religion. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490 (1979).

In *Catholic Bishop of Chicago, supra,* the Court held that an administrative agency could not assert jurisdiction over an organization if doing so tends to jeopardize the religious freedom of the organization unless there has been a clear expression of intent by the legislature to assert such jurisdiction.[4] In applying this rule of construction here, we note that a determination of whether or not a law unconstitutionally infringes upon the free exercise of religion depends largely upon the degree to which the law imposes a direct burden or a severe but indirect

---

[4] In *Catholic Bishop of Chicago* the NLRB attempted to assert jurisdiction over parochial schools that refused to bargain with unions representing the schools' lay teachers. The Court's majority opinion concluded that, because the NLRB's exercise of jurisdiction presented "difficult and sensitive questions arising out of the guarantees of the First Amendment Religious Clauses," the Court would decline to construe the National Labor Relations Act in such a way as to raise those issues absent a "clear expression of an affirmative intention of Congress" in favor of such jurisdiction.

burden upon an individual's ability to practice his religion. *Wisconsin v. Yoder,* 406 U.S. 205 (1972). The burden in the present case appears to be largely indirect, that is, a financial burden rather than a direct restriction on practice,[5] but we believe that the imposition of the unemployment compensation laws on religious schools nevertheless raises serious and sensitive issues of first amendment infringement. *Grace Brethren Church v. California,* Nos. CV 79-93 MRP, CV 79-162 MRP (C.D. Cal. Sept. 21, 1979); *Grace Lutheran Church v. North Dakota Employment Security Bureau,* N.D. , 295 N.W. 2d 767 (1980); *See* Comment, *Bringing Christian Schools Within the Scope of the Unemployment Compensation Laws: Statutory and Free Exercise Issues,* 25 Vill. L. Rev. 69 (1979).

The most obvious burden resulting from the imposition of the Pennsylvania Law would be added tax liability for the schools.[6] While the school assessments here might easily be absorbed, there might well be cases where a marginally operational school might thereby be pushed into bankruptcy.

The imposition of the Pennsylvania Law would also require an increase in record keeping by the schools. The law requires, for instance, that employers file "complete employment and payroll records" and preserve for four years most other records, including records of employees' reimbursed travel expenses, employees' daily attendance records, journals, ledgers and corporate minutes, and that those

---

[5] *Sherbert v. Verner,* 374 U.S. 398 (1963).

[6] The Department's total assessments against the schools for the first and second quarters of 1978 were as follows: Frankford Friends School, $1,783.50; Germantown Friends School, $8,610.00; Northumberland School, $41.40; Christian School of Grace Baptist Church, $248.40; Christian School Association of Greater Harrisburg, $248.40.

records be available for inspection.[7] Sanctions have also been adopted for employers who fail to conform to these requirements.[8]

The third and perhaps most significant burden resulting from unemployment compensation coverage is that the schools would be required to participate in compensation eligibility hearings for their former employees. The findings of the Department reveal that each school hires its staff at least partially on the basis of the religious and moral convictions of the prospective employees and that the schools expect their employees to maintain a demeanor in keeping with their respective religious affiliations. The prospect of an eligibility hearing, therefore, and the consequent likelihood of an increased tax assessment should the employee be successful in proving his or her eligibility, could have a chilling effect on the schools' decisions to terminate an employee's services. Moreover, eligibility proceedings would require that the Department and the courts define "good cause" for the suspension or discharge of a religious school employee, and as the federal district court in *Grace Brethren Church v. California, supra,*[9] stated:

> [D]isputes unquestionably will arise in situations where employees are dismissed for cause and the reason given by the church school is failure to adhere to religious tenets of the church.

> The type of inquiry necessary to the resolution of controversies such as these is almost

---

[7] Sections 206 and 304 of the Pennsylvania Law, 43 P.S. §§766, 784; 34 Pa. Code §§63.51-56. *See* 25 Vill. L. Rev. 69, 79-81 & n. 88-100 (1979).

[8] Section 206 of the Pennsylvania Law, 43 P.S. §766.

[9] Slip opinion at 12.

identical to that which the Court found to involve dangers of excessive entanglement in *Catholic Bishop.*

We believe, therefore, that the imposition of the Pennsylvania Law here would present a substantial risk of infringement upon the schools' first amendment rights, and, inasmuch as *Catholic Bishop of Chicago, supra,* at 504, requires a "clear expression of an affirmative intention" by the legislature to permit such an application of the Pennsylvania Law, we cannot accept the Department's argument that the legislature's deletion of the blanket exemption for all primary and secondary schools indicates an intention to include all private schools under the coverage of the Pennsylvania Law. To the contrary, the fact that the General Assembly retained the exemption in Section 4(1)(4)(8)(a)(ii) of the Pennsylvania Law for certain primarily religious organizations as well as the exemption in Section 4(1)(4)(8)(a)(i) for "churches" indicates that it intended that some religious entities, in addition to those which can be characterized as "churches", would be excluded from unemployment compensation coverage. Because, therefore, the Department has not presented a strong indication of a legislative intent to subject these schools to the unemployment compensation laws, we are constrained to hold that these five schools are "operated primarily for religious purposes." *Grace Brethren Church v. California, supra; Grace Lutheran Church v. North Dakota Employment Security Bureau, supra; Employment Division v. Archdiocese of Portland,* 42 Or. App. 421, 600 P. 2d 926 (1979); *Harvey v. Department of Employment Security,* R.I. , 385 A.2d 1057 (1978). *Contra In the Matter of Northwestern Lutheran Academy,* S.D. , 290 N.W. 2d 845 (1980).

Such an interpretation, moreover, is not only required by the rule set forth in *Catholic Bishop of Chicago, supra,* but it is also consistent with a reasonable interpretation of the words "operated primarily for a religious purpose." Although the Department concluded that, because the schools devote more time in their curricula to traditional secular subjects such as mathematics and reading than they do to actual religious instruction, the schools are not operated primarily for a religious purpose, we cannot agree with this conclusion. As the Department's findings in these cases indicate, in addition to offering actual religious instruction and prayer, each school attempts to emphasize its respective religious principles on a daily basis in its presentation of even secular subjects. Consequently, the Department's attempt to dichotomize the religious and secular aspects of church schools is not a fruitful method for determining their primary purpose. As the United States Supreme Court recognized in *Lemon v. Kurtzman,* 403 U.S. 602, 617: "In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's context is ascertainable, but a teacher's handling of a subject is not. . . . The conflict of functions inheres in the situation." In other words, the goals of affording a legitimate education and of teaching a religious belief or morality, far from being mutually exclusive, can be so interwoven that aspects of faith pervade all aspects of the education. *Wolman v. Walter,* 433 U.S. 229 (1977); *Meek v. Pittenger,* 421 U.S. 349 (1975); *Committee for Public Education v. Nyquist,* 413 U.S. 756 (1973).

Having concluded that each of these five schools is "operated primarily for a religious purpose," we must still consider whether or not the second requirement of the exemption is fulfilled, *i.e.,* that of being

"operated, supervised, controlled or principally supported by a church or convention or association of churches." It seems clear that four of the five schools here concerned are controlled by a church and easily fall under the exemption: the Frankford Friends School and the Germantown Friends School, which are controlled by school committees elected by respective monthly meetings of the congregations; the Northumberland School, which is controlled by a principal who is appointed by the Board of Deacons of the First Regular Baptist Church of Northumberland; and the Christian School of Grace Baptist Church, which is controlled by a principal who is appointed by the Board of Elders of Grace Baptist Church of Carlisle. Not only are these schools under the control of their affiliated churches, *see Employment Division v. Northwest Christian College,* 31 Or. App. 201, 570 P.2d 100 (1977),[10] but each is so closely affiliated with a church that, under a recent interpretation of the United States Court of Appeals for the Fifth Circuit, each might even be classified as a "church" and therefore be exempt from taxation under Section (4)(1)(4)(8)(a)(i) of the Pennsylvania Law as a "church or convention or association of churches." *Alabama v. Marshall,* 626 F.2d 366 (5th Cir. 1980).[11] The application of the statutory lan-

---

[10] In *Northwest Christian College* the Oregon Court of Appeals held that the exemption for organizations "controlled" by a church required a showing of actual control as opposed to legal control.

[11] In *Alabama v. Marshall, supra,* at 369, the court, relying on *Catholic Bishop of Chicago,* held that the the term "church" should be given a liberal interpretation:

> [I]f the employees involved are employed by a "church", the exemption applies to them. Resolution of this question depends upon what is meant by "church" as used in the statute. We are convinced that the plain meaning of

guage does pose a problem, however, as it is applied to the school operated by the Christian School Association of Greater Harrisburg. The findings below show that the Christian School Association of Greater Harrisburg is an independent nonprofit corporation which is not affiliated with any specific church. It owns its own school facility, operates it without the aid of a church and it is controlled by a nine-member board of directors elected by the parents of the students. It is impossible, therefore, to construe the plain language of the exemption as applying here, for, as an admittedly independent entity, this school is not "operated, supervised, controlled or principally supported by a church or convention or association of churches." See *Arizona College of the Bible, Inc. v. Department of Economic Security,* 119 Ariz. App. 542, 582 P.2d 188 (1977), *rev'd on other grounds,* 120 Ariz. 217, 585 P.2d 237 (1978).

We must note, however, that there is little difference, if any, in the degree of emphasis upon religious instruction in the school operated by the Christian

---

"church" requires a definition as something qualitatively greater than the physical building of worship and, at a minimum, the term encompasses the legal entity commonly referred to as a church. The Secretary would avoid the legal consequence of this definition by excluding the very people which comprise a church as an entity and perform its functions. For this court to adopt such a limited definition would be for us to ignore the historic function of churches and defy the definition of the word as used in our vocabulary.

If Congress desires to change the established exemption of unemployment compensation coverage . . . it is well within its ability . . . to reflect that desire by drafting a clear statement to that effect. But, it is not the responsibility or function of this court to perform linguistic gymnastics in order to upset the plain language of Congress as it exists today.

School Association as compared with that in the other four schools, although, of course, the doctrinal substance of the instruction varies among the schools. While under the exemption scheme of Section 4(1)(4) (8)(a)(ii) of the Pennsylvania Law, therefore, it would appear that substantially similar religious schools, all operated for a primarily religious purpose, would receive different tax treatment solely because some are tied to the organizational structure of a church while one is controlled directly by the students' parents, such classification obviously may be said to create a governmental preference for the organizational hierarchy of one form of worship over another and to constitute an unreasonable classification based on religion. So we must consider this situation further.

It is incontrovertible, of course, that the guarantee of the free exercise of religion is a fundamental constitutional right and that freedom to choose a religious education is an inherent part of that right. *Wisconsin v. Yoder, supra.* As the Supreme Court recognized in *Abington School District v. Schempp,* 374 U.S. 203, 222 (1962), "the Free Exercise Clause . . . recognizes the value of religious *training, teaching* and observance and, more particularly, the right of every person to *freely choose his own course with reference thereto,* free of any compulsion from the state." (Emphasis added.) As a result, any enactment of the legislature which, absent a compelling government purpose, directly or indirectly discriminates or effects discrimination among religions is unconstitutional. *United States v. Carson,* 282 F. Supp. 261 (E.D. Ark. 1968). As the Supreme Court stated in *Braunfeld v. Brown,* 366 U.S. 599, 607 (1961):

[T]o hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose *or effect* of a law is to . . . discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. (Emphasis added.)

In the case at hand, we believe it to be self-evident that, not only is there no compelling interest to be served by the organizational distinction, *Sherbert v. Verner, supra* n. 5, but the organizational distinction does not bear even a rational relation to the purposes and policy of the Pennsylvania Law.[12] These distinctions, therefore, are offensive to the free exercise clause of the first amendment. We must hold, therefore, that the exemption for religious schools "operated, supervised, controlled or principally supported by a church or convention or association of churches," is constitutionally offensive. We note, however, that the remaining portion of the exemption, *i.e.,* for "an organization which is operated primarily for religious purposes," is not inseparably connected with and dependent upon the invalid provision and is capable of a meaningful application without the excised portion. We presume, of course, that the legislature intended the requirements of Section 4(1) (4)(8)(a)(ii) to be separable and we will hold, therefore, that the first requirement (*i.e.,* of being "an organization which is operated primarily for religious purposes") will remain operative despite the infirmity of the second. Section 1925 of the Statutory Construction Act of 1972, 1 Pa. C.S. §1925.

---

[12] Section 3 of the Pennsylvania Law, 43 P.S. §752.

The order of the Department is therefore reversed because we believe that the schools here were entitled to an exemption.

### Order

And Now, this 23rd day of December, 1980, the orders of the Department of Labor and Industry in the above-captioned cases are hereby reversed.

---

Dissenting Opinion by Judge Wilkinson, Jr.:

I must respectfully dissent. In my opinion the record amply supports the Department's conclusion that these schools were not operated primarily for religious purposes. On the contrary, a reading of the record convinces me, and therefore, of course, would support the Department's finding, that the primary purpose of the schools was to give the pupils a solid general education. It is the associations' belief, and they may well be correct, that they can do this and at the same time, and in all the courses, weave in the thread of each one's religious beliefs. For example, one witness testified that English could be taught using examples from the scriptures. Quite true—but the primary purpose of the course was not thereby changed to teaching the scriptures. The primary purpose continued to be to teach English.